IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| STUART B.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 7:21-cv-00303 |
| | ) |
| KILOLO KIJAKAZI,[2] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

### REPORT AND RECOMMENDATION

Stuart B. ("Stuart") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for a period of disability and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Stuart alleges that the Administrative Law Judge ("ALJ") erred by failing to properly (1) determine his RFC findings and (2) assess his allegations regarding his symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 22) and **DENYING** Stuart's Motion for Summary Judgment (Dkt. 18).

### STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence supports the Commissioner's conclusion that Stuart failed to demonstrate that he was disabled under the

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Stuart filed for DIB on May 16, 2018, claiming his disability began on February 6, 2018, due to congestive heart failure, high blood pressure, and sleep apnea. R. 15, 185. Stuart's date last insured is June 30, 2023. R. 17. Thus, he must show that his disability began on or before this date and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Stuart's

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

2

applications at the initial and reconsideration levels of administrative review. R. 66–74, 78–93. On April 30, 2020, ALJ Geraldine Page held a hearing to consider Stuart's claim for DIB. R. 35–64. Counsel represented Stuart at the hearing, which included testimony from vocational expert Robert Jackson. On May 19, 2020, the ALJ entered his decision analyzing Stuart's claims under the familiar five-step process[4] and denying his claim for benefits. R. 15–29.

The ALJ found that Stuart was insured at the time of the alleged disability onset and that he has not engaged in substantial gainful activity since February 6, 2018, his alleged onset date. R. 17.[5] The ALJ found that Stuart suffered from the severe physical impairments of congestive heart failure status-post pacemaker implantation, obstructive sleep apnea, hypertension, and obesity. R. 18. The ALJ found that Stuart's depression was non-severe, and he did not have any severe mental impairments. R. 18–19. The ALJ determined that his severe impairments, either individually or in combination did not meet or medically equal a listed impairment. R. 20. The ALJ also considered obesity under Soc. Sec. Ruling 19–2 Titles II and Xvi: Evaluating Cases Involving Obesity, SSR 19–2p, 2019 WL 2374244 (S.S.A. May 20, 2019). R. 20.

The ALJ concluded that Stuart retained the residual functional capacity ("RFC") to perform sedentary work except he can lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for no more than two hours in an eight-hour workday, with an option

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[5] Stuart was 34 years old on his alleged onset date and 36 years old on the date of the ALJ's opinion, making him a younger person under the Act. R. 27.

3

to change posture between sitting and standing every fifteen-thirty minutes briefly and in place without leaving the work station, and no walking greater than five-ten minutes at one time without interruption; occasionally push and pull; no more than frequently perform overhead reaching; never crawl or have exposures to hazardous machinery, work at unprotected heights, climbing ladders, ropes, or scaffolds, or work on vibrating surfaces; and he can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. Stuart should avoid even moderate exposure to extreme temperatures, excess humidity, and pulmonary irritants. Any time off-task may be accommodated during normal breaks. There can be no required driving as a part of the job. Stuart can frequently perform activities requiring near and far acuity and field of vision. R. 21.

The ALJ determined that Stuart is unable to perform any of his past relevant work, but he could perform jobs that exist in significant numbers in the national economy, such as assembler and addressing clerk. R. 27. Thus, the ALJ determined that Stuart was not disabled. R. 29. Stuart appealed the ALJ's decision, and the Appeals Council denied his request for review on March 18, 2021. R. 1–5.

## ANALYSIS

Stuart alleges that the ALJ failed to properly determine his RFC findings and assess his allegations regarding his symptoms.

**A. Medical History Overview**

1. Medical Treatment

On February 5, 2018, Stuart was hospitalized due to complaints of bilateral lower leg edema and abdominal edema and reports of shortness of breath with activity and chest pain. R. 413, 431–33. Stuart's echocardiogram showed an estimated left ventricular ejection fraction

(LVEF) of 30-35%, with moderately decreased global LV systolic function, moderately abnormal LV diastolic filling, LV hypertrophy, severely dilated left atrium, mildly dilated right atrium, mild mitral valve regurgitation, mildly elevated pulmonary artery systolic pressure, dilated inferior vena cava, and elevated left ventricular end diastolic pressure. R. 429. Stuart remained hospitalized through February 8, 2018, and Lorne Dindial, M.D. diagnosed him with acute systolic congestive heart failure, long-standing hypertensive cardiomyopathy, acute pulmonary edema, morbid obesity, prediabetes, and hyperlipidemia. R. 428.

In 2018, Stuart regularly visited cardiologist Christina L. Dunbar-Matos, D.O. and participated in cardiac rehab. At his initial February 15, 2018 visit, Stuart reported that he had been feeling better since he was discharged from the hospital. R. 408. Dr. Dunbar-Matos diagnosed Stuart with chronic combined systolic and diastolic heart failure, essential hypertension, and class-3 obesity, adjusted his medications, and encouraged him to increase his cardiovascular activity. R. 411. Similarly, at his April 6, 2018, visit he reported that he had increased energy and no chest pain, edema, shortness of breath, or issues with his medications. R. 404. While Stuart's nuclear stress test in June 2018 showed a persistently reduced LVEF of 36%, he had a normal stress electrocardiogram (EKG) and normal myocardial perfusion at stress. R. 440. At his June, July, and September 2018 visits, he continued to report that he was doing well and Dr. Dubar-Matos found that he had unremarkable examination findings aside from minimal pedal edema and his prior unchanged diagnoses. R. 384, 392, 532. Dr. Dubar-Matos continued to encourage him to pursue a healthier lifestyle. Id.

Stuart saw Bruce Stewart, M.D. for a sleep evaluation on June 6, 2018, and the physician referred him for a polysomnogram. R. 393–96. On November 7, 2018 visit with Caitlin Anderson, P.A, Stuart's blood pressure was 130/71, weight was 341 pounds, and BMI was

5

recorded as 50.4, but he had unremarkable examination findings. R. 580. Ms. Anderson noted that Stuart had mild obstructive sleep apnea and obesity, and recommended compliance with his continuous positive airway pressure (CPAP) machine therapy and weight loss. Id.

On August 22, 2018, Stuart underwent the successful implantation of a dual-chamber implantable cardioverter defibrillator (ICD) by Richard Massaro, D.O. to treat his congestive heart failure with a persistently and severely reduced LV systolic function. R. 532–41, 544. In follow-up visits with Dr. Dunbar-Matos, Stuart reported low energy, chest discomfort when bending, headaches caused by medications, intermittent palpitations, some dyspnea on exertion, and elevated blood pressure. R. 598, 688, 698, 702, 708, 714. After the surgery, Dr. Dunbar-Matos noted that Stuart was obese and occasionally had "mild" or "minimal" pedal edema. R. 532, 632, 718. In March 2019, Dr. Dunbar-Matos increased Stuart's anti-hypertensive medication. R. 633. In August 2019, Stuart reported to Dr. Dunbar-Matos that he had a few days of palpitations, but otherwise no issues and the doctor noted that he appeared stable. R. 708.

Otherwise, Stuart's physical examinations from the ICD implantation in 2018 through 2020 noted normal findings, including normal cardiovascular findings, normal respiratory effort and breath sounds. R. 598, 679, 686, 692, 702, 712. At his March 2020 visit, Dr. Dunbar-Matos noted that Stuart "looks and feels well," did not adjust his medications, and classified his congestive heart failure as NYHA Class III. R. 687. Dr. Dunbar-Matos encouraged Stuart to follow a healthy lifestyle and to be more physically active. Id.

2. Medical Opinions

On September 27, 2018, James Darden, M.D., a medical consultant with Disability Determination Service, determined that Stuart's chronic heart failure, obesity, and essential hypertension are severe impairments. R. 69. He found that the limitations imposed by his

impairments would not prevent Stuart from frequently lifting and/or carrying ten pounds, occasionally lifting and/or carrying twenty pounds, sitting for about six hours in an eight-hour workday, or standing and/or walking about two hours in an eight-hour workday. R. 70–71. Dr. Darden also found that Stuart has no manipulative, visual, or communicative limitations, can never climb ladders, ropes, or scaffolds, is limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs, and must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. R. 71–72.

Similarly on April 27, 2019, Manish Gambhir, M.D., a medical consultant with Disability Determination Service, determined that Stuart has the same severe physical impairments and limitations found by Dr. Darden. R. 86–90. The ALJ found Drs. Darden and Gambhir's medical opinions persuasive. R. 25.

On April 1, 2019, in a "Physical Capacities Attending Physician Statement," Dr. Dunbar-Matos found that Stuart is unable to sit more than four hours, stand more than one hour, walk more than one hour, or drive more than two hours in an eight-hour workday. R. 617. She also found that Stuart can frequently lift, carry, and push/pull twenty pounds, occasionally lift, carry, and push/pull fifty pounds, and use the hands for both grasping and fine manipulation. R. 618. Dr. Dunbar-Matos further found that Stuart is unable to crawl or climb, but is capable of occasional bending, squatting, balancing, and reaching. Id. Dr. Dunbar-Matos noted that Stuart's heart disease was classified as Class 3 with a marked limitation of physical activity. R. 619. She also noted that Stuart's conditions "will likely not improve." R. 620.

On March 20, 2020, in a "Cardiac Residual Functional Questionnaire," Dr. Dunbar-

Matos reported that due to Stuart's chronic heart failure, he experiences shortness of breath, fatigue, and dizziness. R. 641. Dr. Dunbar-Matos recommended that Stuart should limited to low-stress jobs that allow mild physical labor and frequent breaks. R. 642. Dr. Dunbar-Matos found that Stuart is unable to sit more than thirty minutes before he must walk for a period less than fifteen minutes or sit more than five hours in an eight-hour workday. R. 643–44. She also found that Stuart is unable to stand or walk more than thirty minutes before he must sit for thirty minutes, and that he is unable to stand and walk more than three hours in an eight-hour workday. R. 644–45. Dr. Dunbar-Matos further found that to alleviate his fatigue, Stuart would need to lie down or recline in a supine position for two hours in an eight-hour workday. R. 645. Additionally, Stuart is able to frequently lift and carry ten pounds and occasionally lift and carry twenty pounds but is unable to bend or twist at the waist more than 5% of an eight-hour workday and must avoid exposure to extreme cold, extreme heat, high humidity, fumes, odors, dusts, gases, cigarette smoke, soldering fluxes, solvents/cleaners, and chemicals. R. 646. Dr. Dunbar-Matos noted that these limitations had been present to such extent since February 6, 2018, and that Stuart could be expected to be absent from work about twice a month. R. 647. The ALJ found Dr. Dunbar-Matos's medical opinions unpersuasive. R. 27.

### B. RFC Finding

Stuart asserts that the ALJ minimized objective evidence in the record and failed to build a logical bridge between the evidence and his RFC findings as required under SSR 96-8p. Pl's Br. at 12–16, Dkt. 19. Stuart argues that the ALJ failed to assess Stuart's ability to sustain work activities over the course of an eight-hour workday. Id. Stuart also argues that the ALJ's decision that Dr. Dunbar-Matos's opinions are unpersuasive is not supported by substantial evidence. Id.

Stuart's arguments amount to a disagreement with the ALJ's RFC determination and essentially asks the court to reweigh the evidence.

A function-by-function analysis requires the ALJ to develop an adequate RFC which accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the

claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96–8p and contains sufficient information to allow meaningful review. Unlike the ALJ in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include an analysis of Stuart's medical records, the medical opinions, Stuart's hearing testimony, and the ALJ's conclusions. R. 15–29. The ALJ's opinion specifies how the limitations in the RFC correlate with Stuart's severe impairments.

Stuart argues that the ALJ failed to make "specific findings regarding whether [Stuart's] impairments would result in a need to lie down during the day or result in an unacceptable number of absences from work" and "whether [Stuart's] impairments would cause him to experience episodes of pain and necessitating breaks and how often those breaks would occur." Id. at 13. Further, he argues that the ALJ found that Stuart is restricted to a range of sedentary work due to symptoms related to Stuart's heart problems, but did not explain his conclusion that further limitations are not warranted. R. 24.

Here, the ALJ properly acknowledged Stuart's hearing testimony, medical opinions, treatment history, and subjective allegations R. 18–27. The RFC is consistent with the state agency medical consultants' opinions, which the ALJ found persuasive, limiting Stuart to sedentary work with limitations. R. 25–26. Further, the ALJ found the state agency consultants opinions' persuasive in finding that Stuart could perform sustained work activities in an eight-hour workday. Id. Contrary to Stuart's argument, the ALJ did not minimize the objective evidence and directly considered his conditions following his ICD surgery in the decision. See,

10

e.g., R. 23–25 (mild pedal edema); R. 22–23 (shortness of breath from exertion); R. 22–24 (sub-optimal blood pressure control). Thus, the ALJ considered and explained his conclusion that Stuart could sustain work for an eight-hour day, and that any time off-task may be accommodated during normal breaks. R. 21.

Stuart also argues that the ALJ erred in finding Dr. Dunbar-Matos's opinions not persuasive. Because Stuart filed his application in May 2018, 20 C.F.R. §§ 404.1520c governs how the ALJ considered the medical opinions in his case.[6] That regulation provides that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). To evaluate the persuasiveness of medical opinions and prior administrative medical findings, the most important factors considered are supportability and consistency. Id. Supportability refers to "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation," 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1), while consistency denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim," 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). "The ALJ may explain [his] consideration of the other factors but is only required to do so when contrary medical opinions are equally persuasive in terms of both supportability and consistency." Mary R. v. Saul, No. 3:19cv903, 2021 WL 388463, at *6 (E.D. Va. Jan. 19, 2021); 20 C.F.R. § 404.1520c(b)(3). Under these regulations, physician assistant opinions are considered acceptable medical sources. SSR 06-3p; 20 C.F.R. § 404.1520c.

---

[6] 20 C.F.R. §§ 404.1520c, 416.920c applies to claims filed on or after March 27, 2017.

Here, the ALJ appropriately considered the factors and the record in determining the persuasiveness of Dr. Dunbar-Matos's medical opinions. The ALJ stated his conclusion that Dr. Dunbar-Matos's opinions were "partially supported in that the diagnoses she cited—including CHF and hypertension—could reasonably be expected to produce Stuart's symptoms, resulting in some limitations in the areas she identified." The ALJ noted that Dr. Dunbar-Matos's proposed restrictions such that Stuart needs to lie down or recline for a cumulative two hours in an eight-hour work day and that he would incur two absences a month were not supported by evidence on the record. R. 26–27. The ALJ found that Dr. Dunbar-Matos's opinions were not entirely supported because the opinions were "diagnosis and symptom driven, with limited mention of objective evidence to support the proposed disabling limitations." R. 26. The ALJ explained his assessment of Dr. Dunbar-Matos's opinion and stated that her classifications of Stuart's heart disease as NYHA "Class III" and "Stage C" did not offer support for the proposed limitations. Id. The ALJ further reasoned that Dr. Dunbar-Matos assigned these heart disease classifications, despite the fact that the doctor also noted that Stuart looked and felt well at visits and did not require any treatment plan changes. Id. Also, in support of his finding that Dr. Dunbar-Matos's opinions were unpersuasive, the ALJ compared Dr. Massaro's treatment notes, which characterized Stuart's cardiac symptoms at a lower classification, Class I-II, despite his severely reduced left ventricular ejection fraction. Id.

As to consistency, the ALJ found that Dr. Dunbar-Matos's extreme limitations were inconsistent with the overall record. R. 26–28. The ALJ noted that the opinions of Dr. Dunbar-Matos are inconsistent with the relatively normal physical examination findings she and other physicians documented and with Stuart's reports of considerable subjective relief of his symptoms and his daily activities. R. 26–27; See, e.g., 598, 679, 686, 692, 702, 712. Hence, the

ALJ concluded that Dr. Dunbar-Matos's "degree of limitations is disproportionate to the objective medical evidence and other evidence." R. 27. Therefore, the ALJ thoroughly explained why he found that the opinions of Dr. Dunbar-Matos were unpersuasive overall, why he did not include the need to recline or lie down in the RFC, why he found that no further limitations were warranted beyond those in the RFC, and determined that any time off-task may be accommodated during normal breaks. R. 27.

The ALJ's finding that Dr. Dunbar-Matos's opinions were unpersuasive overall is supported by substantial evidence. See Healer v. Saul, SA–19–cv–01497, 2020 WL 7074418, at *10 (W.D. Tex. Dec. 30, 2020) ("Although the ALJ's discussion of the medical opinions was brief . . . he nonetheless explained whether he found the opinion to be supported by and consistent with the medical and other objective evidence and explained ultimately why he found the opinion to be persuasive"). Stuart's citations to contradictory statements in the medical records amounts to him impermissibly asking the court to reweigh the evidence. See Harper v. Comm'r, No. GLR–13–909, 2014 WL 176777, at *1–2 (D. Md. Jan. 14, 2014) (stating that a court may not reweigh the evidence or substitute its judgment for the ALJ when the ALJ provides substantial evidence to undermine the allegations in a treating physician's opinion). Thus, I find that the ALJ's narrative discussion allows for a meaningful judicial review of the ALJ's consideration of Dr. Dunbar-Matos's opinions and conclusion that her proposed limitations should not be incorporated in the RFC finding.

### C. Subjective Allegations

Stuart asserts that the ALJ erred by not acknowledging the extent to which Stuart performed his daily activities of living and ignored other significant testimony. Pl.'s Br. at 17, Dkt. 19. Stuart also restates his argument that the ALJ failed to properly consider the medical

13

opinions of Dr. Dunbar-Matos, which led to the ALJ's conclusion that Stuart's allegations are inconsistent with the record. Id. at 17.

When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3. Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. "At this step, objective evidence is *not* required to find the claimant disabled." Arakas v. Comm'r, 983 F.3d 83, 98 (4th Cir. 2020) (citing SSR 16-3p, 2016 WL 1119029, at *4–5). SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

Stuart argues that the ALJ failed to address the extent to which Stuart performed his daily activities of living and ignored other significant testimony. Pl.'s Br. at 18, Dkt. 19. However, unlike Arakas, the ALJ did not rely on the absence of objective medical evidence and instead considered the evidence on the record and determined that his allegations were not fully supported by the record. R. 23–27. The ALJ recognized that Stuart's subjective statements about the intensity of his symptoms and their effect on his ability to work were inconsistent with the

14

medical evidence, which included significant evidence that Stuart had a positive response to his overall course of treatment and this his sleep apnea condition improved with treatment. Id.; See Walker v. Saul, No. 2:20-cv-00196, 2021 WL 342570, at *10 (S.D.W. Va. Jan. 6, 2021) ("[T]he ALJ did not discount [c]laimant's subjective complaints based on the lack of objective evidence, but instead properly considered numerous factors, including [c]laimant's daily activities). Cf. Arakas, 983 F.3d at 97 ("Thus, while the ALJ may have considered other evidence, his opinion indicates that the lack of objective medical evidence was his chief, if not definitive, reason for discounting Arakas's complaints.").

As stated above, ALJ properly considered the medical opinions of Dr. Dunbar-Matos and determined that the doctor's restrictions and Stuart's subjective allegations were inconsistent with the evidence on the record. Id. at 17. The ALJ noted that Stuart had a positive response to his overall course of treatment. R. 24. The ALJ explained that "physical examinations since the ICD implantation have shown fairly normal findings, including normal cardiovascular findings, normal respiratory effort and breath sounds, and no edema." Id. The ALJ considered and analyzed the objective evidence, namely, Stuart's denial of "pertinent symptoms like chest pain, dizziness, and palpitations since the ICD placement" and his characterization of his dyspnea complaints as mild in degree and/or stable. Id. The ALJ also factored in Stuart's activities of daily living to assess his subjective allegations and found his involvement in singing at church and in a band for compensation were inconsistent with his and the Dr. Dunbar-Matos's purported disabling restrictions. R. 23 ("factors relevant to the symptoms analysis include the claimant's daily activities"), 49. Further, the ALJ pointed to Dr. Dunbar-Matos's treatment notes at Stuart's March 2020 visit, which stated that Stuart "looks and feels well" with no issues reported. R. 24. Thus, the ALJ concluded that Stuart's "allegations of profound functional loss from his cardiac

conditions are not entirely consistent with his overall course of treatment and objective findings to date." Id.

In fact, the ALJ provided Stuart with a more restrictive RFC than the state medical consultants opinions and accommodated his complaints from his ICD wires, intermittent edema, and testimony about the need to change positions throughout the day by including a "sit-stand" option in the RFC, and further restricted Stuart to five to ten minutes of walking at one time, occasional pushing and pulling, no greater than frequent overhead reaching, and additional environmental limitations due to his ongoing treatment for his severe impairments. R. 25–27.

Though Stuart disagrees with the ALJ's analysis and conclusions, he does not identify any material conflicting evidence that the ALJ failed to consider or any material misstatement of the evidence of record. Rather, Stuart simply asks the Court to reweigh the evidence and reach a different conclusion than the ALJ. It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The ALJ's opinion applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Stuart's subjective complaints with substantial evidence, and that Stuart can perform sedentary work with the limitations stated in the ALJ's opinion.

## CONCLUSION

For the foregoing reasons, I **RECOMMEND** entering an order **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING**

the Stuart's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Elizabeth K. Dillon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including the waiver of the right to appeal.

        Entered: July 11, 2022

        *Robert S. Ballou*

        Robert S. Ballou
        United States Magistrate Judge